**FITCH v. KENTUCKY–TENNESSEE LIGHT & POWER CO., for Use and Benefit of TRI–CITY UTILITIES CO.**

No. 9368.

Circuit Court of Appeals, Sixth Circuit.

June 4, 1943.

---

Laurence B. Finn, of Bowling Green, Ky. (Finn & Orendorf and Laurence B. Finn, all of Bowling Green, Ky., on the brief), for appellant.

James W. Stites, of Louisville, Ky., and Lynne A. Warren, of New York City, for appellee.

Before HICKS, SIMONS, and McALLISTER, Circuit Judges.

McALLISTER, Circuit Judge.

The Kentucky-Tennessee Light & Power Company brought suit against Henry D. Fitch, its former president, the Nashville Coal Company, and Justin Potter, its president, alleging that Fitch, in purchasing coal for the Power Company, from the Coal Company, had accepted bribes from Potter and the Coal Company; that the three defendants thereby violated the Robinson-Patman Act; and that they were liable to the complainant in treble damages. Various motions to strike and dismiss were denied by the district court, 37 F.Supp. 728, and, thereafter, in consideration of a covenant not to sue, Potter and the Coal Company paid to the Power Company the sum of $75,000. After a pre-trial hearing and order, in which questions of law were reserved, a jury found, in answer to two special interrogatories, that Fitch had received a commission, brokerage, or other compensation, from the Coal Company, or its president, in connection with the pur-

14

chase of coal by the Power Company, during the period from June 19, 1936, through September 12, 1939.

After verdict, the questions of law having been determined against Fitch, the case was, on motion, referred to a Special Master to fix the damages in accordance with the statute and, on a finding that the Coal Company had been damaged in the amount of $58,788.01, this sum was trebled and judgment entered thereon against Fitch. Subsequently, the judgment was credited with the amount of $75,000, previously paid by the Coal Company and Potter.

None of the evidence on the trial of the many questions has been included in the record on appeal; and we have before us only the pleadings in the case, the district court's orders, its memorandum on motion to dismiss, and the final judgment entered. No answer was ever filed to appellee's bill of complaint. Appellant had moved to dismiss the bill on the ground that it did not allege such facts as would give the court jurisdiction over Fitch; that Fitch's alleged acts did not "constitute subject matter over which this court has jurisdiction"; and that the bill failed to state a cause of action "upon which this court can grant relief." This motion was denied.

The appeal, therefore, is based upon the denial by the district court of appellant's motion to dismiss. In explanation, it may be observed that the proceedings before the jury resulted from a pre-trial order based on a stipulation between the parties that the jury was to pass upon the question of whether Fitch had received commissions from the Coal Company or its president.

In the same pre-trial order, it was recited that the defendant "reserves, for all purposes of defense and appeal, the issues of law heretofore disposed of" on his motion to dismiss, "and the conclusions of law * * * that the payments * * * to Fitch were made to him while he was engaged in interstate commerce, * * * such conclusions of law being based upon the alleged facts regarding interstate commerce set forth in plaintiff's pleadings and exhibits and bill of particulars, subject, of course, to their competency as evidence, which, for the purpose of defendant's exceptions to the court's ruling and judgment, and for the purpose of defense and appeal, are accepted as undisputed evidence."

Although the manner of presenting the issues for review is somewhat confused, we can only conclude, from all of the foregoing, that the allegations of the bill are to be accepted as true, and that the legal questions to be determined are: (1) whether the Robinson-Patman Act applies to the acceptance of the commissions by Fitch; and (2) whether Fitch was engaged in interstate commerce, and accepted the commissions in the course of such commerce. It is not disputed that Fitch accepted commercial bribes from the Coal Company.

On the first question—whether the statute applies where an agent of the buyer accepts commissions from the seller on the purchase of goods, and retains them for his own benefit—the statute [Title 15, Sec. 13(c), U.S.C.A.] provides: "That it shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

The commercial bribery, alleged and now conceded, consisted of the payment by the Coal Company to Fitch, of 15 cents for each ton of coal sold to the Power Company. Fitch did not pay these amounts over to the Power Company, but concealed the transaction and kept the money for himself. On this particular phase of the case, it is contended that if he had turned the money over to his company, there would have been a violation of the statute; but that payment of a bribe to Fitch, personally, without its receipt by his company, was not an offense within the provisions of the Act. On this point, the controversy depends upon whether the payments to Fitch were "to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid."

■ Fitch was the president of the Power Company, and as such, its agent and representative. It is contended that inasmuch as Fitch kept the money for himself, he was not "acting in fact for or in behalf, or * * * subject to the direct or indirect control" of the Power Company in the transaction; and that, therefore, acceptance of such commercial bribes was not covered by the Act. But the statutory prohibition is against payment of such compensation to an agent, or representative, as well as to an intermediary therein where such intermediary is acting in behalf of or is controlled by a party other than the one paying the compensation. If it be of any concern in the case, it may be remarked that the phrase— "where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction" other than the party paying the compensation—relates to the intermediary referred to in the statute, and not to the agent or representative of the buyer. As remarked by the district court in its opinion denying appellant's motion to dismiss [37 F.Supp. 734] the words "acting in fact for or in behalf, or is subject to the direct or indirect control of any party to such transaction" qualify the word "intermediary," but do not qualify the word "agent" or the word "representative." In this regard, the district court said: "The qualifying words were used for the purpose of excluding from the act legitimate brokerage, which is is no wise condemned by the act. Since a broker would be an 'intermediary', legitimate brokerage would be included and made illegal unless such qualifying words were used. The act catches such intermediaries as are acting for the buyer or under the buyer's control, without being an agent or representative in the legal sense of the word. Accordingly, the statute makes it illegal to make such a payment either to the other party to the transaction or to an agent or representative of such party."

It is contended that the conduct of Fitch in accepting the commissions did not fall within the provisions of the statute for the reason that, in accepting the money, he was not acting for his company and, therefore, the payment to him for his personal benefit, was not a payment "to an agent, representative, or other intermediary therein."

■ To such argument, the answer is that a faithless agent, in the course of representing his principal, does not by his departure from fidelity, become less an agent. In this case, Fitch received the commissions in connection with the purchases of coal. In connection with such purchases, he acted as an agent or representative of the company; but in keeping the commissions, he acted secretly for his own interests. Any payment of compensation by a seller to an agent or representative of the buyer, except for services rendered, is prohibited and unlawful, whether the agent, in receiving the commissions, is acting in the transaction in behalf of the buyer, or merely for his own pocket.

Appellant argues that the Act is concerned only with price discriminations extended by sellers to different buyers; and that there is no proof that the seller in this case so discriminated. The fact is that the buyer is suing for damages, not because of receiving the benefit of discriminatory prices, but because, on account of the fraud, it was obliged to pay more for its coal than it would otherwise have paid in a competitive market. While various sections of the statute are concerned with price discrimination, we do not agree with the claim that the provisions of the Act are limited thereto.

■ Under Sec. 13(c) (Title 15 U.S.C. A.), the granting of a commission to the agent of the other party to the transaction was specifically forbidden as an unfair trade practice because of its tendency to lessen competition and create monopoly. Oliver Bros. v. Federal Trade Commission, 4 Cir., 102 F.2d 763. The section deals with a trade practice which has frequently resulted in unfair competition. It deals with one particular subject, namely, allowances or brokerage of such a nature and kind that commerce, generally, is affected thereby; and it constitutes a specific prohibition of a specific act. Great Atlantic & Pacific Tea Co. v. Federal Trade Commission, 3 Cir., 106 F.2d 667, certiorari denied 308 U.S. 625, 60 S.Ct. 380, 84 L.Ed. 521. "It is clear that the statute prohibits payment of brokerage by the seller to the buyer or his agent or representative or controlled intermediary except for services rendered." Biddle Purchasing Co. v. Federal Trade Commission, 2 Cir., 96 F.2d 687, 691, certiorari denied 305 U.S. 634, 59 S.Ct.

101, 83 L.Ed. 407. "It is plain enough that the paragraph, taken as a whole, is framed to prohibit the payment of brokerage in any guise by one party to the other, or the other's agent. * * * Paragraph (c) is a distinct and complete provision in itself making illegal the giving or taking of commissions or their equivalent under the circumstances mentioned in the text." Quality Bakers of America v. Federal Trade Commission, 1 Cir., 114 F.2d 393, 398.

Plainly, the payment of the secret commissions to Fitch was an unfair trade practice, and obviously resulted in lessening competition in the sale of coal to the Power Company. It would have been practically impossible for any other company to sell coal to appellee, when the president of the Power Company had such an understanding with the Coal Company and such a motive to purchase from it all the coal requirements for his company.

Payment of the prohibited commission to an agent for the benefit of his principal, is the same as payment to the principal. A payment of a commission to a party is as easily and as usually effected by paying it to an agent, to be handed over to a party, as paying it directly to the party itself; and, therefore, such a payment would be to the party, regardless of the form of giving it to the agent for that purpose. If the statute prohibited only payments to an agent, where the agent turned the money over to his principal, it would not be necessary to prohibit payments to the agent of, or representative of, such principal. The injunction against payment to the purchasing party, includes payment to its agent for this purpose. Unless, as observed by the district court, the foregoing construction is given to the statute, Sec. 13(c) (Title 15 U.S.C.A.) would be superfluous, in that it would only apply to rebates which ultimately go to the purchaser, and such a transaction is covered by Sec. 13(a) (Title 15 U.S.C.A.), which deals with price discrimination between purchasers.

With regard to the acceptance of commissions by an agent of the buyer, it is not merely an acceptance of commissions by the agent on behalf of his principal, that is unlawful; it is the acceptance of commissions from a seller by an agent of the buyer in connection with the sale of merchandise in the course of interstate commerce, that is also envisaged by the statute.

In this case, payment of commissions by the Coal Company to Fitch in connection with the sale of the coal was unlawful and in direct contravention of the Act.

We come, then, to the second contention of appellant, that he was not engaged in interstate commerce and did not receive the commissions in the course of such commerce.

There were two written contracts between the Coal Company and the Power Company. One contract, dated March 7, 1933, provided for the purchase of coal for the entire requirements of the Power Company for a period of five years—shippings to be made as and when directed, and to be consigned, reconsigned, or diverted en route, as the Power Company might direct, to any plants then or thereafter operated by it or its affiliated companies. The Power Company operated plants in both Kentucky and Tennessee. According to the contract, the coal was to be mined from Kentucky mines unless the Coal Company was unable to make all shipments from such mines, in which case it could, with the buyer's consent, ship from any other mines that it might be operating, or for which it might be acting as sales agent.

The second contract was executed April 6, 1937, but dated back to March 7, 1933, and was to run for a period of ten years. The provision as to the amount of coal to be shipped was "Quantity: Requirements." The other provisions were similar to those above recited in the first contract, except that it was stated that, "primarily," the coal shipped under the contract should be to the buyer's plants in Kentucky; but it was also provided that the buyer could consign, reconsign, or divert en route any shipments to any plants it might then or thereafter be operating. There was an added statement in the "terms and conditions," that "the price stated herein is fair and reasonable and does not impose burdens and obstructions upon interstate commerce. * * *"

Appellee herein, in its complaint, further alleged that the Coal Company shipped coal under the contracts from its mines in Tennessee to appellee's plants in Kentucky, and from mines in Kentucky to its plants in Tennessee.

In this regard, involved and technical though appellant's contentions be, they may be summed up in his claim that the coal shipped across the state line was not shipped under the contracts specified in the

complaint; and that appellee, by its complaint and bill of particulars, limited itself to proof of coal which had been shipped under the written contracts. We do not agree with this contention. The coal shipped across the state line was included, by virtue of the contract provisions above mentioned, in the contract between the parties. If it were necessary to say more on this phase of the case, it might be observed that the contracts merely set the scene for the sale of coal under the fraudulent arrangement; and, although Fitch did not himself sign the contracts, he had plenary authority over the purchase of coal and it was through him that the entire deal was consummated. Appellant's emphatic arguments, based upon the legal technicalities of the pleadings, are without merit.

The sales of coal to appellee necessitated the delivery of coal from Kentucky to Tennessee, or from Tennessee to Kentucky; or from other states to both Kentucky and Tennessee. If the coal were mined in Kentucky, it would be necessary, in taking care of the entire requirements of the Power Company, to ship some of it to appellee's plants in Tennessee; and if the coal were mined in Tennessee, it would be necessary to ship some of it to appellee's Kentucky plants. If the coal could not be procured in either state, it would be necessary to ship from other states to both Kentucky and Tennessee; and it was understood that, in such a case, the Coal Company could ship from any other mines for which it might be acting as sales agent.

Moreover, the Power Company supplied power to many customers, beyond the boundaries of the states in which it maintained its plants; and the coal purchased was for the purpose of producing such power. The transaction, here in question, constituted a restraint upon freedom of competition in the channels of interstate trade, which it is the purpose of the statute to maintain. See Van Camp & Sons v. American Can Co., 278 U.S. 245, 49 S.Ct. 112, 73 L.Ed. 311, 60 A.L.R. 1060. A combination which embraces restraint of trade within a single state, falls within the provisions of the federal anti-trust laws if it affects the stream of interstate commerce; and the courts decline to defeat "this purpose in respect of such a stream and take it out of complete national regulation by a nice and technical inquiry into the non-interstate character of some of its necessary incidents and facilities, when considered alone and without reference to their association with the movement of which they were an essential but subordinate part." Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 403, 66 L.Ed. 735, 23 A.L.R. 229. Where commodities are sold within one state, with the understanding that they are to constitute part of the stream of goods sold in interstate commerce, and this is a typical, constantly recurring course, the current thus existing is a current of commerce among the states, and the prior transaction, though wholly negotiated and executed within a single state, is a part and incident of interstate commerce. Swift v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518; Lemke v. Farmers' Grain Co., 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 467; American Can Co. v. Ladoga Canning Co., 44 F.2d 763.

In the case before us, the coal was sold for use in producing electric power to be distributed and sold in interstate commerce. Obviously, the price of the coal directly affected the prices charged to consumers of power in various states. It was as much an element of the commodity sold as though it were a constituent part thereof. In this regard, the sale of the coal affected the stream of commerce; and, furthermore, as has been mentioned, the sale and shipment of the coal across the state lines also affected the stream of commerce. The transaction complained of was a fraudulent trade practice and resulted in unfair competition. It occurred in the course of commerce, and in relation thereto, Fitch was a party engaged in interstate commerce. The conduct of which he was guilty was prohibited by the statute.

Much importance is seemingly attached to the claimed error of the trial court in denying motions to strike certain allegations and exhibits from appellee's bill of particulars. Therein we find no reversible error. Moreover, in view of the fact that no testimony was transmitted in the record, much of the discussion in appellant's brief, indirectly addressed to questions of the admissibility of certain proofs on the issues of damages and violation of the statute, cannot here be reviewed; and various other contentions are not meritorious.

The judgment of the district court is affirmed.