**Sally BRIDGES, Tammy Brady, Plaintiffs, Appellants,**

v.

**MacLEAN–STEVENS STUDIOS, INC., Lawrence MacLean, Blair MacLean, Defendants, Appellees.**

**No. 99–1126.**

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1999.

Decided Jan. 6, 2000.

---

Jon Holder, with whom Holder & Grover, P.A. was on brief, for appellants.

John H. Rich III, with whom David B. McConnell, and Perkins Thompson Hinckley & Keddy were on brief, for appellees.

Before TORRUELLA, Chief Judge, LYNCH and LIPEZ, Circuit Judges.

TORRUELLA, Chief Judge.

This appeal arises from an antitrust suit involving the school portrait industry. Plaintiff-appellants are parents of school-age children who attend schools that have entered into exclusive contracts with MacLean–Stevens Studios, Inc. Defendant-appellees are MacLean–Stevens Studios, Inc., a photography studio that services the school portrait market, and its owners Lawrence and Blair MacLean. Appellants allege that appellees engaged in commercial bribery in violation of 15 U.S.C. § 13(c) (Count I), price discrimination in violation of 15 U.S.C. § 13(a) (Count II), and conspiracy to restrain trade in violation of 15 U.S.C. § 1 (Count III). On December 17, 1998 the district court entered summary judgment for defendant-appellees on all counts. *See Bridges v. MacLean–Stevens Studios, Inc.*, 35 F.Supp.2d 20 (D.Me.1998). This appeal followed. Having carefully considered the record and the law, we affirm.

## BACKGROUND

The facts necessary to decide this case are not in dispute and were aptly summarized by the district court. Appellee MacLean–Stevens Studios, Inc. is a New Hampshire corporation that offers student portrait services in several New England states. Appellants are parents of school-age children who attend schools that have entered into exclusive contracts with MacLean–Stevens. These contracts provide that the school will receive a commission of twenty percent (20%) of the price of the portrait packages sold and designate MacLean–Stevens as the exclusive provider of portraits on school property. As a result,

the school portraits purchased by appellants are priced according to a "commission price list." Prices on the commission price list are generally twenty percent (20%) higher than portrait prices charged by MacLean–Stevens for children who attend schools that decline a commission. The nature and quality of the pictures are identical regardless of whether the commission price applies.

It is the schools' decision to accept or decline a commission. If a school enters into a contract that provides for a commission, the commission goes to the school's general fund. If a school declines the commission, the reduction in costs is passed on to parents in the form of lower portrait prices. Before 1996, parents were not informed that the prices on the commission price list included a commission paid to their children's school. At no time, however, has a school's contract with Mac-Lean–Stevens obligated parents to purchase school portraits.

All schools provide some services to MacLean–Stevens regardless of whether they accept the commission and designate MacLean–Stevens as the exclusive portrait provider. These services include: scheduling photo sessions, providing and arranging space for the photo sessions, distributing the portrait packages to students, and collecting payment from students in the elementary grades. Appellees, in turn, provide yearbook, team, and identification photos to all schools free of charge. Appellees also provide each elementary school student with a free class portrait.

In the school portrait industry, the practice of entering into an exclusive dealing contract that provides for a commission to the school is not unusual. Some of appellees' competitors have even paid commissions of up to fifty percent (50%). Most of these contracts, including appellees', are one-year contracts, but some have a duration of up to three years. During the 1995–1996 school year, MacLean–Stevens had 159 accounts with schools in Maine, 112 of which accepted a commission and designated MacLean–Stevens as their exclusive photographer, and 49 of which did not.

In addition to MacLean–Stevens and other photography studios that take portraits on school property, numerous businesses in New England offer portrait services off school grounds. For example, both Wal–Mart and J.C. Penney have studio photography services. Appellants are aware of these options and have purchased portraits of their children from these businesses on several occasions.

## DISCUSSION

### I. *Standard of Review*

This Court reviews orders for summary judgment de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor. *See Houlton Citizens' Coalition v. Town of Houlton,* 175 F.3d 178, 184 (1st Cir.1999) (citing *Mullin v. Raytheon Co.,* 164 F.3d 696, 698 (1st Cir.1999)). This standard of review does not limit us to the district court's rationale; in contrast, we may affirm the entry of summary judgment on "any ground revealed by the record." *Id.*

### II. *15 U.S.C. § 13(c)—Commercial Bribery*

Appellants contend that the commissions paid by MacLean–Stevens constitute commercial bribery in violation of 15 U.S.C. § 13(c), commonly known as section 2(c) of the Robinson–Patman Act. Appellees counter that (1) appellants do not have antitrust standing because they have not suffered an antitrust injury; (2) commercial bribery is not a cognizable claim under § 13(c); (3) the commissions paid to the schools in this case do not cross the "seller-buyer line" as required by § 13(c); (4) the commissions are lawful pursuant to the statutory exemption for "services rendered"; and (5) appellees have antitrust immunity under the Nonprofit Institutions Act, 15 U.S.C. § 13c. The district court

rejected appellees' argument that the commissions paid to the schools in this case were for services rendered, but agreed that the Nonprofit Institutions Act applied. *See Bridges,* 35 F.Supp.2d at 25. The district court further concluded that even if the Nonprofit Institution Act were not applicable, appellants could not demonstrate that the schools acted as the agents of parents with regard to the purchase of school portraits from MacLean–Stevens. *See id.*

■ We agree with the district court that, as to the portrait sales, the schools are not agents or intermediaries of the parents, and therefore the commission agreements between MacLean–Stevens and the schools do not violate section 2(c) of the Robinson–Patman Act. Accordingly, the entry of summary judgment for appellees was proper. We thus need not reach the other arguments addressed by the district court or raised by appellees.

■ Section 2(c) of the Robinson–Patman Act states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods, wares, or merchandise, either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c). The Robinson–Patman Act was enacted "to curb and prohibit all devices by which large buyers gained discriminatory preferences over smaller ones by virtue of their greater purchasing power." *Federal Trade Comm'n v. Henry*

*Broch & Co.,* 363 U.S. 166, 168, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). Prior to the statute's enactment in 1936, a congressional inquiry revealed that large buyers and sellers were circumventing the discriminatory price prohibitions of the Clayton Act by insisting on indirect price concessions. *See id.* at 168–69, 80 S.Ct. 1158. The most widely used method for obtaining an indirect price concession was a "dummy broker." A dummy broker was a fiction, set up by the buyer, that rendered no services and yet collected a "brokerage" fee from the seller. The fictitious broker then paid the fee to its employer, the buyer. *See id.* at 169, 80 S.Ct. 1158.

Although dummy brokers were the primary target of section 2(c), the Supreme Court has stated that Congress "phrased section 2(c) broadly, not only to cover the other methods then in existence but all other means by which brokerage could be used to effect price discrimination." *Id.* The Court further indicated, in dicta, that:

The Report of the House Judiciary Committee described the brokerage provision as dealing "with the abuse of the brokerage function for purposes of oppressive discrimination." And although not mentioned in the Committee Reports, the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the "bribing" of a seller's broker by the buyer.

*Id.* at 169–70 n. 6, 80 S.Ct. 1158 (citations omitted); *see also California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) ("bribery of a public purchasing agent" could violate section 2(c)) (dictum). The Senate Report discussing section 2(c) states:

The relation of the broker to his client is a fiduciary one. To collect from a client for services rendered in the interest of a party adverse to him, is a violation of that relationship; and to protect those who deal in the streams of commerce against breaches of faith in its relations of trust, is to foster confidence in its

processes and promote its wholesomeness and volume.

S. Rep. No. 1502, at 7 (1936).

Against this background, five circuits have concluded that commercial bribery is within the ambit of section 2(c). *See Harris v. Duty Free Shoppers Ltd. Partnership,* 940 F.2d 1272, 1274 (9th Cir.1991); *Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1066 (3d Cir. 1988); *Grace v. E.J. Kozin Co.,* 538 F.2d 170, 173 (7th Cir.1976); *Fitch v. Kentucky–Tennessee Light & Power,* 136 F.2d 12, 15–16 (6th Cir.1943). Other courts, however, have expressed their doubts. *See Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 371–72 (3d Cir.1985); *Excel Handbag Co. v. Edison Bros. Stores,* 630 F.2d 379, 387 (5th Cir.1980). For purposes of this appeal, we assume, without deciding, that commercial bribery is actionable under section 2(c). Nevertheless, appellants' claim still fails.

■ Appellants argue that the commissions paid by MacLean–Stevens to the schools on the profit from portrait sales violate section 2(c). In order to find a violation of section 2(c), "the payments involved must be made to a party to the transaction or to someone connected with that party in an agency, representative, or intermediary relationship." *Rangen, Inc. v. Sterling Nelson & Sons, Inc.,* 351 F.2d 851, 862 (9th Cir.1965). In other words, the payments must cross the "seller-buyer line." *Seaboard Supply Co.,* 770 F.2d at 372 ("In the appellate decisions which have found commercial bribery within the ambit of section 2(c) the common thread has been the passing of illegal payments from the seller to buyer or vise versa."). The Third Circuit explained, "Congress intended that legitimate brokerage relationships not be affected," and therefore liability may only be imposed "when the seller-buyer line has been passed." 770 F.2d at 372.

Where a transaction involves a seller, buyer, and a third party, the seller-buyer line is crossed if the seller or buyer pays a commission to a third party acting as the agent or intermediary of the opposing party. Here, appellants allege that the seller-buyer line was crossed because the schools acted as intermediaries on behalf of the parents when they contracted with Mac-Lean–Stevens for school portrait services. This argument was considered and rejected by the Fourth Circuit in *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.,* 903 F.2d 988, 991 (1990).

In *Stephen Jay Photography,* the court was required to determine if commercial photographers violated the Robinson–Patman Act by paying commissions to schools on the profit from portrait packages sold to parents. The critical inquiry, the court stated, was "whether, as a matter of law, the payments made from appellees to the schools from profits on portrait sales crossed the seller-buyer line." *Id.* at 992. The court concluded that the seller-buyer line had not been crossed because "circuit court cases finding commercial bribery in violation of section 2(c) all involve the corruption of an agency or employment relationship." *Id.* at 993 (citing *Grace,* 538 F.2d 170; *Ragen,* 351 F.2d 851; *Fitch,* 136 F.2d 12). The facts before the court did not meet this test.

> [T]he relationship between the students and the schools does not rise to one akin to that of agency or employment. Without such a relationship to connect the students' purchasing decisions to the schools, the payments from the appellees to the schools do not cross the seller-buyer line.

*Id.* In reaching this result, the court acknowledged that:

> Unquestionably, the schools and the students enjoy a special relationship of trust. And it is true that the schools arranged to have yearbook photographs taken by appellees and encouraged students to purchase portraits from them. However, letters encouraging the students to purchase these photographs either expressly or implicitly indicated

that their decision to purchase portraits was optional. From this correspondence it is abundantly clear that the schools did not assume a position resembling that of a portrait purchasing agent for the students.

*Id.*

The core facts of this case are identical to those in *Stephen Jay Photography.* There, as here, "the schools did not have the authority to bind the [parents] to purchase portraits. Instead [parents] were free to purchase portraits from appellees or from a photographer of their choice, or to purchase no portraits from anyone." *Id.* Because the schools had no control over the parents' purchasing decisions, the agency or employment relationship required by section 2(c) is lacking. *Id.; see also Harris,* 940 F.2d at 1275; *Environmental Tectonics,* 847 F.2d at 1066; *Grace,* 538 F.2d at 171–73; *Rangen,* 351 F.2d at 853–58; *Fitch,* 136 F.2d at 15–16; *Pharmacare v. Caremark,* 965 F.Supp. 1411, 1424–25 (D.Haw.1996); *Edison Elec. Inst. v. Henwood,* 832 F.Supp. 413, 414–19 (D.D.C.1993).

We need look no further than *Stephen Jay Photography* to affirm the entry of summary judgment on this issue. Nonetheless, we find additional support for our decision in *Harris v. Duty Free Shoppers Ltd. Partnership,* 940 F.2d 1272, 1275 (9th Cir.1991). In *Harris,* the owner of a duty free shop, Peter Harris, filed a section 2(c) claim for commercial bribery against his competitor Duty Free Shoppers. The facts in the case were not in dispute. Duty Free Shoppers paid commissions to tour companies and tour guides to promote its shop with tourists by (1) scheduling stops of tour buses at the store; (2) supplying the store with advance information about the number and characteristics of tour groups that were stopping; (3) distributing promotional materials to the tourists; (4) assisting the tourists in ordering items; and (5) explaining the regulations covering duty free merchandise to the tourists. Harris, in contrast, did not engage in this practice. The district court granted summary judgment in favor of Duty Free Shoppers, and the Ninth Circuit affirmed.

On appeal, Harris argued that the district court erred because there was clearly a fiduciary duty between tour guides and tourists. The court agreed that section 2(c) "encompasses cases of commercial bribery tending to undermine the fiduciary relationship between a buyer and its agent, representative, or other intermediary," *id.* at 1274 (citing *Rangen,* 351 F.2d at 858), but concluded that the facts did not indicate that section 2(c) had been violated.

> [T]he tour guides and tourists are not in an employment relationship; the tour guides are not shopping experts; and they are not at all times subject to the control of the tourists. Moreover, the tourists are free to purchase their souvenirs and gift items anywhere; in fact, they are free not to purchase at all. On these facts, we hold that tour guides and tour operators are not in an agency or fiduciary relationship with their passengers, nor do they serve as intermediaries subject to the direct or indirect control of those passengers, with regard to the transactions in question—the purchase of Duty Free's retail goods.

*Id.* at 1275 (internal quotations omitted). In rejecting Harris' claim that there was a fiduciary duty between tour guides and tourists, the court emphasized that its inquiry was limited to the transaction in question.

> In addressing whether the payments involved were made to a party to the transaction or to someone connected with that party in an agency, and thus fiduciary relationship, ... "[r]eference must be made to the transactions in question to determine whether or not the necessary relationship exists."

*Id.* (quoting *Rangen,* 351 F.2d at 862).

Here, as in *Harris,* appellants urge the court to consider the parties' relationship generally, rather than have the court ex-

amine the "transactions in question." *Id.* We decline to do so. Accordingly, we have no problem rejecting appellants' argument that the schools in this case are subject to the indirect control of "named plaintiffs in particular and the parents in general." While appellants' proposition may be true in some general sense, the only relevant transaction is the sale and purchase of school portraits. As to this limited transaction, the record is clear that the schools are not in an agency or fiduciary relationship with the parents, nor do they serve as intermediaries subject to the "direct or indirect control" of the parents. Therefore, summary judgment on this claim was proper.

### III. *15 U.S.C. § 13(a)—Price Discrimination*

■ MacLean–Stevens offers its school portrait packages according to two separate price lists. A commission price list applies where a school elects to receive a commission. In all other cases, a less expensive, non-commission price list is offered. Count II of appellants' amended complaint alleges that this dual pricing structure constitutes price discrimination in violation of 15 U.S.C. § 13(a). The statute states:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States ... and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing

herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered....

15 U.S.C. § 13(a).

■ The Supreme Court has held that there are two prerequisites to recovery under 15 U.S.C. § 13(a). *See Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222–24, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). First, the prices complained of must be below an appropriate measure of the defendant's costs. *See id.* Second, the defendant must have a reasonable prospect of recouping its investment in below-cost prices. *See id.* In this case, the district court concluded that appellants had failed to raise a genuine issue of fact as to either requirement. *See Bridges,* 35 F.Supp.2d at 28. We agree.

First, there is no evidence in the record that appellees offer portrait packages at below cost. As the district court accurately concluded, appellees' dual pricing structure is the result of a difference in market costs. Where a school elects to receive a commission, the prices of portraits are increased by the additional cost of the commission. Where, however, a school declines the commission, the lower price of portraits reflects a decrease in the cost of production. Accordingly, the prices complained of are not below "an appropriate measure of the defendant's costs." *See Brooke Group,* 509 U.S. at 222–24, 113 S.Ct. 2578; *see also Barry Wright Corp. v. ITT Grinnell Corp.,* 724 F.2d 227, 230–36 (1st Cir.1983) (holding Sherman Act does not prohibit prices that exceed both incremental and average costs).

■ Second, even accepting appellants' argument that the non-commission portrait packages are below cost, appellants cannot demonstrate that MacLean–Stevens has a reasonable prospect of recouping any in-

vestment in below-cost prices. The Supreme Court has stated:

> Determining whether recoupment of predatory losses is likely requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market. If market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, the plaintiff's case has failed.

*Brooke Group*, 509 U.S. at 226, 113 S.Ct. 2578 (citation omitted). Therefore, "where the market is highly diffuse and competitive, or where new entry is easy ... summary disposition of the case is appropriate." *Id.* Here, the record indicates that (1) MacLean–Stevens does not control a dominant share of the school photography market and (2) there are relatively few barriers to entry in that market. Conversely, there is no indication in the record that MacLean–Steven could maintain supracompetitive prices. Accordingly, appellants' price discrimination claim fails as a matter of law.

### IV. *15 U.S.C. § 1—Restraint of Trade*

■ Count III of appellants' complaint alleges a "conspirac[y] between the [appellees] and the schools to engage in the form of commercial bribery described herein in order to gain a competitive edge" in violation of 15 U.S.C. § 1. The statute states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1.

Appellants have provided the Court with no citations and little argument in support of this claim. The district court, for its part, concluded that Count III is contrary to both law and logic. *See Bridges,* 35 F.Supp.2d at 29. Once again, we agree.

■ First, appellants offer no evidence of a conspiracy other than the exclusive contracts between MacLean–Stevens and the schools. As a matter of law, a contract by itself does not constitute a conspiracy. *See Stephen Jay Photography,* 903 F.2d at 995; *Burns v. Cover Studios, Inc.,* 818 F.Supp. 888, 893 (W.D.Pa.1993). Therefore, without at least some explanation of "how the contracts operated to restrain trade," *Stephen Jay Photography,* 903 F.2d at 995, appellants cannot prevail on a section 1 conspiracy claim. Second, appellants have offered no evidence of any concerted activity, "an essential element of a section 1 claim." *Id.* at 994. Third, we note that there is no evidence in the record that the exclusive contracts between Mac-Lean–Stevens and the schools have an anticompetitive effect or foreclose a substantial percentage of the school portrait market. *See U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 595 (1st Cir.1993).

Finally, the Supreme Court has stated "if the factual context renders respondents' claim implausible—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Here, we find that appellants' section 1 claim is illogical. As the Fourth Circuit stated in *Stephen Jay Photography,* "appellants have articulated no motive the schools might have to engage in such a conspiracy. Indeed, logically the converse is true because the schools benefit when photographers aggressively compete for contracts." 903 F.2d at 994. Accordingly, summary judgment on this claim was proper.

### CONCLUSION

For the reasons stated above, we **affirm** the judgment of the district court.